Well, you may notice that we're a little short of judges this morning. Judge Goldenhersch is on the panel, as you know, and actually he's ill today and couldn't be here. Judge Schwarm is assigned to this case. It's the only case he had on the docket today, and he had a meeting in Chicago that he had to go to. Both Judge Schwarm and Judge Goldenhersch will listen to the arguments, which, as you know, were posted on the Supreme Court's website, and will be full participants in the decision of this case. But as far as argument goes, you're stuck with me today. So whenever you're ready to proceed, Mr. Hudson, or let's see, no, I'm sorry, Arkell, Mr. Arkell. Can you please report, Arkell? My name is Tom Arkell. I represent the intervener on Midwest Electronics Gaming, LLC. There appear to be two primary issues to be addressed. First, whether or not this court has jurisdiction, or if the Illinois Gaming Board is exclusive or primary jurisdiction. And second, whether a temporary restraining order or preliminary injunction entered by the circuit court without any bond will properly enter. With regard to the issue of whether or not the Illinois Gaming Board is exclusive or primary jurisdiction, this case involves interpretation and forcibility of pre-licensure contracts between video gaming terminal operators and establishments. In short, my client's position is that the Illinois Gaming Board has exclusive jurisdiction over the licensing of applicants, but does not have exclusive or primary jurisdiction over the interpretation or enforcement of pre-licensure video gaming agreements entered into before both parties are licensed by the Illinois Gaming Board. Let me ask you a question, and we talked about the 777 case, you know, and everybody here involved in this case knows what it says, and it says pre-licensure agreements are okay. Even if, let's just suppose that the Illinois Gaming Board decided that anyone who is disqualified from having a license shall not be allowed to profit in any way from Illinois Gaming. Even if, under all the rules of contract law, these pre-licensure agreements were valid, wouldn't the gaming board still have authority to say you can't assign it, you know, if you're not licensed, if you lose your license? Theoretically, that, I guess, is possible. And if that's the case, then doesn't the gaming board have a broader range of authority over Illinois Gaming than is confined within what we do in courts? In practice, what the Illinois Gaming Board has done is licensed applicants and given permission for terminal operators to place games and given permission for games to be turned off. The 777 case, Mr. Riffle, who is the plaintiff's attorney in that case, chose to bring that case up in Ottawa, in LaSalle County. This case here, my client obviously wasn't the plaintiff. The plaintiff chose to bring the case in circuit court. And the gaming board, as far as I'm aware, has not adjudicated disputes. Is it conceivable that it could? I guess it's conceivable that it could, but I'm not aware of any cases where it has. Maybe the reason it hasn't is because of 777. And that's very conceivable. And that's the only decision in any appellate court in the state on this. Although I know we, just in this district, we have maybe 10 cases pending over these kinds of disputes over the assignment of pre-licensure contracts. And I was involved in the 777 case, Your Honor. I represented Best Gaming as well as Gaming Entertainment Management. And part of it was the way the case was structured in that matter, where the issue was when was the license assigned and what was the definition of a use agreement. But to answer your question, you go back to your initial question. You asked, well, should companies profit, or if there was a rule that companies shouldn't profit because they're not licensed. Well, in this case, B&B lost its license. B&B entered into the contract with the American Legion in their hand, lost its license, and then allegedly assigned that license to Hyperactive. And I realize this case at least is a little different from some other ones we have pending here because most of those are cases where the entity was never licensed. Correct. Signed up a bunch of people, were never licensed, sold those contracts to somebody else. And I guess my point is, and I'm not saying that that would be the rule that the Gaming Board should or should not adopt. But the question is, could they adopt that kind of rule? Because in those kind of cases, you could have an entity that never had a prayer of being licensed. And under 777, they would still be allowed to profit under the Illinois gaming laws, even though there was no way they were ever going to be licensed through these pre-licensure agreements. I think that happened. Yeah, and it seems like the Gaming Board could put a stop to that if they want to. And, in effect, they have through the rule they passed as of a certain date, July 2014. It was July 15, 2014, where they passed the rule stating that both parties had to be licensed at the time the contract was entered into. And the 777 case was like the other cases. I know there's the J&J cases before the court here already. Those cases, as far as I understand, as well as the Baskin case, they were never licensed. This case is different in that B&B was licensed and it lost its license. And I think that's a significant differentiating factor here as to why the injunction should be dissolved, in addition to all the other factors that go into whether an injunction is properly entered. Clearly ascertainable rates, adequate remedy of law. And so if you want, Your Honor, I'd like to address your questions. Well, we asked that you address jurisdiction, and you've told us what your position is. And you've spent a lot of time and effort here on the subsidy issues, so why don't you go ahead and go into that. Sure. I would add, Your Honor, if the court obviously finds that there is no jurisdiction, then the injunction should be dissolved, because this court and the serving court would not have jurisdiction. Right. So if there is no jurisdiction, the injunction should be dissolved. And even if there is jurisdiction, the injunction should be dissolved, because in this case, there was a temporary restraining order that was entered. When the American Legion didn't even participate in a hearing, then the preliminary injunction was also entered, and Hyperactive did not provide any evidence as to irreparable harm. They provided conclusory statements, but no evidence as to what irreparable harm they would suffer, what accounts would they lose, what business would they lose. There was nothing in the record. In terms of, I mean, it's obvious that they lose money if they don't get to put their machines in, right? Yes, they would, but there was no evidentiary hearing. Also, the preliminary injunction, the manager was one manager of Hyperactive, Gregory Urosky from Chicago. He didn't show up. He didn't even sign the verification or file an affidavit in the case. So what did they lose? They talked about a domino effect, but if one domino falls over by itself, there's no effect. And they provided nothing. There's nothing in the record to support the issuance of a temporary restraining order or a preliminary injunction. Circuit court judges unilaterally lowered the bar for the issuance of a temporary restraining order and a preliminary injunction. If the bar is that low, anybody can go in, get a temporary restraining order without any hearing, go in and get a preliminary injunction without any evidentiary hearing or providing any witness to stand up and state what a devastating effect that it could have on their business, that they could lose all these different accounts. There was none of that. Nothing like that in this case. What was their allegation of not having an adequate remedy at law? I mean, everything, I mean, the gaming board keeps track of every dime that gets spent, right? Correct. So, I mean, if ultimately the circuit court determined that somebody else should have their machines in, there would be a way of determining exactly how much a party lost by not having their machines in. Yes, exactly, Your Honor. The Illinois Gaming Board posts revenue. It's on their website. You can see how much each terminal operator, I'm sorry, each establishment makes each month. So if Midwest is allowed to have its games on, if the American Legion is allowed to make money, that will be posted as soon as the games go live on the Illinois Gaming Board's website. So in this specific case, I think that there's clearly an adequate remedy at law if the injunction is dissolved and the games can be turned on. The gaming board has already been provided a Midwest contract by the Legion. The Legion chose Midwest. The gaming board has also allowed Midwest to put its games in at the Legion, but they're sitting there not making any money, which doesn't do any good. It's been 14 months since the games were put in, and the Legion hasn't made a dime. I mean, just to ask, as far as the procedure here, I mean, the gaming board did take some kind of action and said, Midwest, you can put your machines in. Correct. They allowed them to put the games in. But when that was done, that was not in any way in having – it had nothing to do with resolving the dispute between Midwest and HyperActive. No, Midwest put its games in, and then immediately HyperActive went in. Filed the lawsuit. Obtained a temporary restraining order without any hearing with the Legion presence, and then Midwest intervened in the case. I mean, HyperActive did not go to the gaming board and say, it's wrong for you to authorize Midwest's machines because we have the superior contract. They took that issue to court, which gets back to the jurisdiction issue. Correct. So there's nothing in the record to show that HyperActive went to the gaming board to ask the gaming board to resolve the dispute. Another point that I'd like to bring up, Your Honor, is obviously an injunction is an equitable remedy. And things have changed significantly since the temporary restraining order and preliminary injunction were entered. So it's for the sake of argument that they were properly entered, and they weren't. But for the sake of argument that they were, since that time, HyperActive has now sold the Legion B&B contract to J&J Ventures. So any equity that was in favor of HyperActive is now gone. It doesn't transfer over to J&J. HyperActive had very little of any documented relationship with the Legion, and J&J has none. So things have changed significantly. And there's a case, Crosswood Products v. Souter, which was cited by HyperActive for the proposition that HyperActive's loss of competitive position is also a protective interest that supports injunctive relief. But the appellate court dissolved the injunction, entering the case finding, quote, we believe that the mere passage of time has altered the circumstances under which the circuit court acted. This court may dissolve an injunction as to its prospective effect when the requisite showing is made that its continuation is no longer equitably justified. Like Crosswood, the continuation of an injunction is not equitably justified in any way in this case, and it should be dissolved. Unless you have any more questions, Your Honor, I'd like to reserve time. Let me ask one other question. Sure. You do have an argument about the terms of the contract. Yes. And default, you know, an item of default is losing your license. Yes. Briefly discuss that, okay? Sure. In the contract, it allows either party to terminate the contract if the other party loses its license. B&B lost its license, and the Legion was free to contract with whichever video gaming company it chose, and it chose Midwest Electronics Gaming. So one of the events of default is if either party loses its license. B&B lost its license. An event of default occurred, and the Legion was free to contract with whichever company it chose, and, again, it chose Midwest Electronics Gaming. So there's no clearly ascertainable right. There's no enforceable contract here, and there's no likelihood of success on the merits by hyperactive. All right. Thank you. You'll have five minutes for rebuttal. All right. Horvath? Good morning, Your Honor. Good morning. If it pleases the court, I'll proceed. My name is Seth Horvath. I'm here for Hyperactive Gaming. As Your Honor is aware, Hyperactive was the initial plaintiff in this case before the circuit court, and while the case was on appeal, the agreement that's at issue here was a sign from Hyperactive to J&J Ventures. J&J Ventures was given leave by the circuit court to intervene while the appeal was pending. J&J is also an intervener in this appeal and has joined the brief that Hyperactive filed. So I'll be presenting on behalf of the real party in interest here is J&J at this point. At this point, it is. As far as the injunction goes, I want to clarify a point, Your Honor, in response to one of the counsel's arguments. J&J still has a very real interest in the injunction that was entered by the circuit court, and that's what we're here on. We're here on the entry of that preliminary injunction, and the court has to take a look at what the circuit court did and really ask the question of whether, when Hyperactive was interested in the injunction, Hyperactive asserted a prima facie case that there was a fair question on a claimed right, and the claimed right stems from the use agreement that Hyperactive entered into with the American Legion, and so the circuit court interpreted that agreement in favor of Hyperactive, and it found that the agreement was validly assigned from B&B to Hyperactive and that that agreement gave Hyperactive the exclusive right to operate its video gaming terminals at the Legion, and it concluded that that right trumped the claimed right of Midwest to operate its terminals. And that's all based on 777? It's a little bit different than 777 in that the 777 case involved a party that assigned an agreement prior to the time the party had obtained the license from the Illinois Gaming Board, whereas in this case... It was assigned right before they lost their license. That's right, that's right. But they had a pending application for renewal at the time that the assignment occurred, and there is a portion of the 777 case that addresses the assignment that occurred here. The relevant portion of 777 is the part that deals with Rule 615, Gaming Board Rule 615, which says that if there's an application that's been made for a hearing on the denial of a license, the license isn't considered denied until a final agency decision has been rendered. That's just under their administrative rules? That's under their administrative rules. In other words, B&B is allowed to continue operating until a decision is made on that petition for re-hearing. That's correct, that's correct. And at the time that the agreement was assigned to Hyperactive, B&B was in fact still operational. So this case is a little bit different from 777, although 777 does provide some guidance on the application of Rule 615 to the facts here. But before I get too far into the merits, I do want to briefly address the jurisdictional questions that the court raised. And I do agree with counsel's position that there is no exclusive Gaming Board jurisdiction, that there is no primary Gaming Board jurisdiction, but I think there's two separate questions the court is asking about what the Gaming Board can do in terms of its regulation of terminal operator disputes. One question is, can the Gaming Board enact a rule that prohibits an unlicensed terminal operator from assigning a use agreement? And the answer to that question, I believe, is yes, and the Gaming Board has done that through its recent amendment to Rule 315. There's one limitation on that rule. It only applies prospectively. Why do you think that's in there? I think that's in there because there's a due process issue with revoking a vested contractual right that existed prior to the modification of that rule.  acknowledged that it would be problematic to declare retrospectively that terminal operators who had made these assignments prior to licensure They wouldn't have that problem without Triple 7, though, would they? Well, I still think that there's a, regardless of what Triple 7 said. Because it's Triple 7 that says those pre-licensure agreements have validity. It is, it is. And again, I point out, it's the only district in the state that's ruled on that, and other districts aren't bound by it. That's right, that's right. And again, I think the facts we have here are a little bit different than in Triple 7 because you don't have the pre-licensure issue in the same fashion. We have an existing license, and we have a denial of renewal. But to answer the Court's question, Triple 7 was the case that said that the assignment of a pre-licensure agreement was valid. And so that's the existing law in the state. And the Court could decide to disagree with that if it so chose. We're not actually challenging that aspect of Triple 7. This case is a little bit different. This case is a little bit different. So the other jurisdictional question that the Court seems to oppose, which is separate from whether the Gaming Board can enact a rule that bars pre-licensure assignments, is can the Gaming Board create an administrative structure to address these terminal operator disputes on its own? And I think there are several problems with the Gaming Board doing such a thing, one of which— Well, there may be a problem. I mean, you may be able to come up with problems, but did the Illinois legislature give them broad enough authority to do that? I think you're out of—that's one of the issues. In Illinois, we have the doctrine of delegation, and the delegation doctrine says that an administrative agency, which is a creature of statute, has to act in accordance with the authority that's delegated to it by the legislature. And the delegation of legislative authority has to be fairly specific. And there's a well-known Illinois Supreme Court case on delegation. It's the Traynor case. It's a 68-ill-second-540. In the Traynor case, the Illinois Supreme Court found that the director of the Department of Public Aid didn't have any authority to prevent the plaintiff in that case from participating in a particular state program. And the relevant language from Traynor is that when the legislature vests discretionary authority in an agency, it has to create intelligible standards—that's the quote— intelligible standards that the agency has to follow in exercising that authority. Here we have a broad grant of regulatory authority, but we don't have any more specific grant of authority that enables the gaming board to hear these terminal operator disputes between private terminal operators. Further to that point, in addition— Well, they're clearly given authority over who can be involved in the Illinois gaming industry. I agree with that, Your Honor. And one way of looking at this, at least, is if you— these are a little bit different facts, but on the issue of jurisdiction, we're talking about all these different kinds of cases. If we have people who never got a license, never had a chance of getting a license, under the pretty clear authority that the legislature did give the Illinois gaming board, it seems to me like the gaming board could say, we're not going to allow you to profit indirectly under the Illinois Gaming Act if you can't profit directly. It could have done that if 777 hadn't come along. You see what I'm saying? But, I mean, looking at this from a bigger picture point of view here, we have an Illinois gaming board that was created by the legislature, and the legislature said the board shall have jurisdiction over and shall supervise all gaming operations governed by this act. And instead of them doing that on these disputes, we've got lawsuits filed all over this district, and I think probably statewide, over who has the right to operate these gaming machines in various establishments based on these assignments back and forth of these pre-legislature agreements. Wouldn't it make a lot more sense and be more efficient for the Illinois gaming board to do its job and decide who gets to put the machines in? And here, let me just say this, in this particular case, we have an injunction. In some of the other cases, an injunction's entered and somebody's allowed to operate their machines. The American Legion, they're not making any money while you guys are fighting in court for months. They want to get their machines turned on. I acknowledge, Your Honor, there are many of these disputes pending around the state, and in terms of whether it would be more efficient and more effective for the gaming board to handle the disputes, I think that's a judgment that the legislature and the gaming board have to make. And even if we were to assume that the legislature did in fact delegate to the gaming board the authority to handle these disputes, the gaming board hasn't yet put into place any set of administrative rules that it can use to govern terminal operators. And there are limitations on the extent to which the board can do that. The board has to go through JCAR, the Joint Committee on Administrative Rules. The board, assuming it were delegated the authority to do so, would still have to create an administrative regimen to hear terminal operator disputes. And thus far, it hasn't indicated any interest in doing that. The board, I think, is aware of these lawsuits, and again, whether it's a wise decision of the board or not, I think the decision remains that of the board. And it simply hasn't put the necessary administrative framework in place to deal with these terminal operator disputes. We can't rewrite history, of course, but what if, let's just assume for a moment, not saying it was, but let's say 777 was wrongly decided in that the 777 court should have sui sponte said, this is the jurisdiction of the gaming board. Case dismissed, take it to the gaming board. All that would be in place. We wouldn't have lawsuits all over the state. We wouldn't have the potential for different districts of the appellate court coming to different conclusions about the pre-licensure contracts. And isn't one of the whole purposes of the Illinois Gaming Board is to have uniform rules throughout the state? Your Honor, I think with 777, we again get back to the difference between the issue of barring the assignment of pre-licensure agreements, on which there is currently a rule, and having a framework in place for addressing disputes between terminal operators, which would be a separate regimen. And under the latter scenario, where the gaming board would actually be addressing these disputes, essentially having administrative hearings over disputes between terminal operators, that's where we would need this set of JCAR enacted regulations, regardless of the 777. That's a procedure or a framework that would need to be put in place regardless of 777. There's just no mechanism right now. There's another case, I wanted to bring it to the court's attention, because it wasn't cited in the oral argument. It's the Kauffman grain case. It was decided by the court district back in 1989. It's at 179, ILAP 3rd, 1040. In Kauffman, the Department of Agriculture had a policy of adjudicating disputes between private grain dealers and private grain manufacturers. It had a policy, but it had no rule. And in assessing or evaluating that decision-making scheme, the fourth district found that the department improperly relied on rules that were not properly promulgated to adjudicate those disputes. So the court's point was, even though the department had a desire to adjudicate those private disputes, a lot like the private terminal operator disputes we have here, it didn't have any framework in place to do that. And I think another thing that even takes this case one step further than Kauffman is, the gaming board seemingly has not taken any action, or has not chosen to take any action yet, in addressing these terminal operator disputes through its own administrative framework. So I think there are some complications with the jurisdictional question that arise even outside of the 777 framework. If Your Honor has any more questions on that, I'd be happy to address them. If not, I'll go on to the other questions. Thank you, Your Honor. The preliminary injunction that was entered in this case was entered based on the Circuit Court's interpretation of the use of the word that Hyperactive entered into with the Legion. And the interpretational question that Midwest has raised pertains to a language in paragraph 6G of that agreement about an event of default, defining an event of default. And under that paragraph, an event of default happens when either party surrenders its license. Is that the language it uses, surrenders its license? Yes, Your Honor. The exact language is, the event of default occurs when either party surrenders its license, or has its license terminated, canceled, or revoked. And the emphasis that Midwest is placing on the either party language, I think, is misplaced. Because Midwest's interpretation of that language is that the concept of a party-to-agreement is a static one. The party can never change. However, that's exactly what an assignment does. It changes the identity of the parties to the agreement. Let me just answer this question, then. I mean, under that provision, then, basically, your argument would be that there could never be a termination of the agreement by default because of loss of license. Because anybody that's not a complete fool is going to assign it, like happened here, even though maybe it's a day before they actually lose their license, because you have a period of time that the decision's not final while petitioned for re-hearings file. That basically... If someone were to let that deadline lapse, then they could lose the license, or they'd lose the agreement, and the assignment would be valid. To your point, Your Honor, as long as you were to abide by that time period where your license is still in effect, you could continue to assign the agreement. And doesn't that render that default provision meaningless? I don't think it does, Your Honor, because what really happens is if you adopt their interpretation of the either party language, it renders the assignment provision meaningless. Paragraph 17 of the agreement creates rights between the parties where an assignment can occur under the agreement, and assignment is legitimate. And it's set forth in the agreement, and it's consistent with Illinois law on assignments. There's a lot of case law that says that when an assignee assigns an agreement to an assignee, the assignee steps into the shoes of the assignor, and the assignee stands in privity with the original contracting party. All of that case law, all of those cases that deal with the law of assignment, are automatically incorporated by reference into this agreement as a matter of contract interpretation. And the court has to take into account the fact that by narrowly interpreting the meaning of the term party, it's reading out the assignment provision from the contract, and it's delegitimizing the assignment provision, or voiding the assignment provision. So the court can't simply focus on the words either party. It's also important to note that Midwest's interpretation of that language really reads a word into it. It's interpreting the language meaning either original party to the contract. And this gets back to the whole concept of assignments. The parties to a contract can change upon assignment. When the agreement gets assigned, the parties change. You're not stuck with the original party structure. One more point on contract interpretation I think it's really important to note. If the court were to give any credence to Midwest's interpretation of that language, it would render a number of other contractual provisions very problematic. If B&B were the only relevant party for purposes of this agreement in terms of being able to govern or assess compliance with the obligations under the agreement, once the agreement gets assigned to Hyperactive, for instance, Hyperactive can be in compliance with all of the other terms of the agreement. It can be providing terminals. It can be servicing those terminals. It can be servicing the needs of the location. But under Midwest's interpretation, even though Hyperactive is complying with all of those obligations under the agreement, the fact that B&B is not renders the agreement unenforceable. So if you literally interpret party to mean only B&B, then even if Hyperactive or J&J is in compliance with all of the other terms, all of the other obligations, an event of default can still be declared, and that's an absurd interpretation of the contractual language, and we believe that the circuit court saw it in Hyperactive's favor on that point, and we would urge the appellate court to as well. Your Honor, I want to briefly touch on the issue of irreparable harm, which counsel raised in his argument. There's a record on irreparable harm that the circuit court relied on. There were no express findings of fact on irreparable harm, but there don't have to be. There's case law that says even in the absence of express findings of fact by a circuit court, a decision the circuit court makes without express findings will be deemed to have findings in favor of the prevailing party. We cite that case law in our briefs. The absence of express factual findings by the court isn't sufficient to void the preliminary injunction. The court simply decided to hear arguments of counsel and enter injunctive relief, and the court also had a factual record on which to base its preliminary injunction. There was a verified complaint. There was an affidavit submitted with the verified complaint by Hyperactive's regional director of operations. The court had that material in front of it. The legion didn't file an answer denying the substantive allegations in the complaint or indicating that it lacked sufficient factual knowledge to answer. Let me ask you one final question. Your time's almost up. On the issue of adequate remedy at law, why isn't money damages an adequate remedy when we know we can have down-to-penny computation of what these machines take in? Your Honor, I think you have to look at the penny-by-penny computation on a location-by-location basis. We have data from the rest of the state. We don't have any historical data from this particular location, so we have no baseline from which to infer damages. We simply have the aggregate data that the gaming board generates on a statewide basis, and that's why it's problematic to say that our damages are easily computable. I see my time is up, Your Honor, so I would ask that the court affirm the preliminary injunction that the circuit court enter in this case. Thank you very much. Thank you. Thank you, Your Honor. Just as a few points of clarification, B&B never placed or operated video gaming terminals at the legion because B&B lost its license before the legion was licensed, just as a point of clarification. Yeah, I guess the contract that Midwest entered into with the legion was also before the legion was licensed. That is correct. Second, HyperActive's interpretation of the default provision, as the court notes, does render the default provision meaningless. The reality is that HyperActive bought a worthless contract. That's HyperActive's problem and potentially their problem between them and B&B and now J&J. HyperActive could have gotten the legion to sign a contract directly with the legion to try and resolve the problems of the contract, but it did not do so. Assuming that this court has jurisdiction, the elements necessary for the issuance of an injunction were not met. There's no thoroughly ascertainable right. The contract is not valid as the event of default occurred. HyperActive purchased a defaulted contract and they did not, as the legion, as I already know, sign a valid contract. There's no evidence of goodwill or reputational conclusions in the record. No irreparable harm, no evidence or proof of any actual potential loss of business or accounts. Again, only conclusions. Is there a limit on the number of machines that you can put into a licensed establishment? Yes. And with regard to the American Legion, did Midwest put in the maximum number they were allowed? My understanding is they did, yes. And I don't know why they wouldn't, you know. So I get back to my question about money damages. I mean, there's a limit. Anybody's going to put in the maximum they're allowed. Is there a reason to believe that one machine or one licensed operator's machine is likely to take in more money than another? There are different types of machines that can be placed, but there's only so many machines that have been authorized by the Illinois Gaming Board. And so can the revenue be different based on the type of service that's provided? Possibly, but generally there's not much difference, Your Honor. I think it's my understanding. They can be different games, but there's only so many that are, and I'm not on the streets, but that's my understanding is there's only so many games to choose from. And as far as damages being calculated, as already noted, the revenues are readily available online. Hyperactive provided no information about business or accounts it could have lost, and it cannot lose any business or accounts now because these assets were sold to J&J. As far as equity, Hyperactive no longer owns the B&B contract. The same equities that arguably existed no longer exist. There are no transgressions of a continuing nature and no continuing harm. More than 14 months have passed since the temporary strain order was first entered. Since that time, Legion has made no money, and the B&B contract was sold to J&J. In conclusion, this court appears to have jurisdiction to decide the case. The injunction entered by the Circuit Court was properly entered as a matter of law as the necessary elements were not met for the issuance of an injunction, and the equities of the case clearly do not favor an injunction continuing now that Hyperactive sold the B&B contract while the appeal has been pending. The injunction should be dissolved. Midwest should be permitted to turn on its games. The American Legion should be permitted to make money from the games, and this court, as a matter of law, should decide that an event of default occurred when B&B lost its license, which permitted the Legion to enter into its contract with Midwest. Whether or not this court has jurisdiction, the injunction should be dissolved. Thank you, Your Honor. All right, thank you both for your briefs and your arguments. The court will take this matter under advisement and issue a written decision in due course.